IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHRISTINE L.,[1]                                    Case No. 6:19-cv-00127-SB

               Plaintiff,              **OPINION AND ORDER**

       v.

ANDREW M. SAUL, Commissioner of Social
Security,

             Defendant.

_____

**BECKERMAN, U.S. Magistrate Judge.**

      Christine L. ("Plaintiff") brings this appeal challenging the Commissioner of Social

Security's ("Commissioner") denial of her application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act. The Court has jurisdiction to hear this appeal pursuant

to 42 U.S.C. § 405(g). For the reasons explained below, the Court reverses the Commissioner's

decision and remands for an award of benefits.

///

_____

      [1] In the interest of privacy, this opinion uses only the first name and the initial of the last
name of the non-governmental party in this case. Where applicable, this opinion uses the same
designation for a non-governmental party's immediate family member.

**STANDARD OF REVIEW**

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* Where the record as a whole can support either the grant or denial of Social Security benefits, the district court "'may not substitute [its] judgment for the [Commissioner's].'" *Bray*, 554 F.3d at 1222 (quoting *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

**BACKGROUND**

**I.      PLAINTIFF'S APPLICATION**

Plaintiff was born in February 1962, making her forty-eight years old on February 15, 2011, the alleged disability onset date. (Tr. 100, 111.) Plaintiff completed high school and one year of college and has past relevant work experience as a fast food service manager. (Tr. 28, 204.) In her DIB application, Plaintiff alleged disability due to migraines, chronic fatigue

syndrome, psoriatic arthritis, asthma, and post-traumatic stress disorder ("PTSD").[2] (Tr. 100, 111, 203.)

The Commissioner denied Plaintiff's application initially and upon reconsideration, and on November 5, 2015, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 20.) Plaintiff and a vocational expert ("VE") appeared and testified at a hearing held on July 6, 2017. (Tr. 37-99.) On January 2, 2018, the ALJ issued a written decision denying Plaintiff's DIB application. (Tr. 20-30.) On December 4, 2018, the Appeals Council denied Plaintiff's request for review, making the ALJ's written decision the final decision of the Commissioner. (Tr. 1-6; Tr. 181-84.) Plaintiff now seeks judicial review of that decision. (Compl. ¶ 1.)

## II.    THE SEQUENTIAL PROCESS

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social

---

[2] To be eligible for DIB, "a worker must have earned a sufficient number of [quarters of coverage] within a rolling forty quarter period." *Herbert v. Astrue*, No. 07-cv-01016, 2008 WL 4490024, at *4 n.3 (E.D. Cal. Sept. 30, 2008). Workers accumulate quarters of coverage based on their earnings. *Id.* Typically, "the claimant must have a minimum of twenty quarters of coverage [during the rolling forty quarter period to maintain insured status]. . . . The termination of a claimant's insured status is frequently referred to as the 'date last insured' or 'DLI.'" *Id.* (citations omitted). Thus, Plaintiff's date last insured of December 31, 2013 (*see* Tr. 20) reflects the date on which her insured status terminated based on the prior accumulation of quarters of coverage. If Plaintiff established that she was disabled on or before December 31, 2013, she is entitled to DIB. *See Truelsen v. Comm'r Soc. Sec.*, No. 2:15-cv-02386, 2016 WL 4494471, at *1 n.4 (E.D. Cal. Aug. 26, 2016) ("To be entitled to DIB, plaintiff must establish that he was disabled . . . on or before his date last insured." (citing *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999))).

Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five

steps are: (1) whether the claimant is currently engaged in any substantial gainful activity; (2)

whether the claimant has a severe impairment; (3) whether the impairment meets or equals a

listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether

the claimant is capable of performing other work that exists in significant numbers in the

national economy. *Id.* at 724-25. The claimant bears the burden of proof for the first four steps.

*Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the

burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137,

140-41 (1987).

The Commissioner bears the burden of proof at step five of the sequential analysis, where

the Commissioner must show the claimant can perform other work that exists in significant

numbers in the national economy, "taking into consideration the claimant's residual functional

capacity, age, education, and work experience." *Tackett*, 180 F.3d at 1100. If the Commissioner

fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations

omitted).

## III.     THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is

disabled. (Tr. 20-30.) At step one, the ALJ determined that Plaintiff had not engaged in

substantial gainful activity since February 15, 2011, the alleged disability onset date. (Tr. 22.) At

step two, the ALJ determined that Plaintiff suffered from the following severe impairments:

"[P]soriatic arthritis, migraine headaches, asthma, obesity, chronic fatigue syndrome, [and]

posttraumatic stress disorder[.]" (Tr. 22.) At step three, the ALJ concluded that Plaintiff did not

have an impairment that meets or equals a listed impairment. (Tr. 23.) The ALJ then concluded

that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of light

work, subject to these limitations: (1) Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently, (2) Plaintiff can sit, stand, and walk for about six hours in an eight-hour workday, (3) Plaintiff can occasionally climb ladders, ropes, and scaffolds, (4) Plaintiff can frequently crouch, crawl, and climb ramps and stairs, (5) Plaintiff needs to avoid concentrated exposure to pulmonary irritants and hazards, (6) Plaintiff needs to be limited to "low-stress work" that does not involve "persuasive communication tasks," teamwork tasks, "fast-paced production pace work," or many "changes of work routine or setting," and (7) Plaintiff needs to be able to "miss work about one day per month due [to the] symptoms of her impairments." (Tr. 24.) At step four, the ALJ concluded that Plaintiff was unable to perform her past relevant work as a fast food service manager. (Tr. 28.) At step five, the ALJ concluded that Plaintiff was not disabled because a significant number of jobs existed in the national economy that she could perform, including work as a photocopy machine operator, office helper, and mail clerk. (Tr. 28-29.)

## DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by: (1) failing to provide clear and convincing reasons for discounting Plaintiff's symptom testimony; (2) failing to provide legally sufficient reasons for discounting the opinion of Plaintiff's treating physician, Aaron Holmes, M.D. ("Dr. Holmes"); and (3) failing to account for certain limitations in formulating Plaintiff's RFC.

As explained below, the Court concludes that the Commissioner's decision is based on harmful legal error and not supported by substantial evidence. The Court further concludes that Plaintiff satisfies the credit-as-true standard, and the Court does not have serious doubt about whether Plaintiff is disabled. Accordingly, the Court remands Plaintiff's case for an award of benefits.

## I. PLAINTIFF'S SYMPTOM TESTIMONY

### A. Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation and quotation marks omitted).

Under Ninth Circuit case law, clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008), *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007), and *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

### B. Analysis

In this case, there is no evidence of malingering and the ALJ determined that Plaintiff has provided objective medical evidence of underlying impairments which might reasonably produce

the symptoms alleged. (*See* Tr. 25, reflecting that the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms"). The ALJ was therefore required to provide specific, clear, and convincing reasons for discrediting Plaintiff's symptom testimony. *See Ghanim*, 763 F.3d at 1163. The ALJ failed to meet that standard here.

### 1.    Plaintiff's Activities

As an initial matter, the ALJ discounted Plaintiff's testimony based on her activities. (*See* Tr. 27; *see also* Def.'s Br. at 8, citing Tr. 27 and arguing that the ALJ appropriately discounted Plaintiff's testimony because she engaged in activities that were "inconsistent with the alleged symptoms"). In support of his finding that Plaintiff engaged in activities that were incompatible with the severity of symptoms alleged, the ALJ cited generally to Exhibit 3F, which consists of sixty-five pages of rheumatology records dated March 11, 2011 to February 6, 2015. (Ct. Tr. Index at 2.)

The Commissioner notes that the sixty-five pages of treatment records that the ALJ cited show that Plaintiff's treating rheumatologist, Yong Zhu, M.D. ("Dr. Zhu"), stated in May 2013 (and later repeated) that Plaintiff had "no difficulty for daily activity." (Def.'s Br. at 8, citing Tr. 392). Based on that excerpt, the Commissioner argues that the ALJ appropriately concluded that Plaintiff engaged in daily activities that are incompatible with the severity of symptoms alleged. (Def.'s Br. at 8.) The Commissioner also claims that in summarizing Plaintiff's records, the ALJ referred to other activities that support the ALJ's decision to discount Plaintiff's testimony. (Def.'s Br. at 8.)

The Court is not persuaded by the Commissioner's argument. In discounting Plaintiff's symptom testimony based on her reported activities, the ALJ merely cited generally to sixty-five pages of medical records and did not explain how any specific activity undermined Plaintiff's

testimony. In other words, the ALJ made only general findings. Accordingly, the ALJ erred in discounting Plaintiff's testimony based on her reported activities. *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) ("[W]e require the ALJ to 'specifically identify the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines the testimony.' That means '[g]eneral findings are insufficient.'") (citation omitted).

The Commissioner contends that the ALJ "reasonably inferred" that Dr. Zhu's description of Plaintiff's ability to perform her daily activities undermined Plaintiff's testimony. (Def.'s Br. at 8.) The ALJ, however, was required but failed to make any explicit findings. *Cf. Drake v. Colvin*, No. 15-1250, 2016 WL 4608227, at *7 (N.D. Cal. Sept. 6, 2016) ("'Long-standing principles of administrative law require [a court] to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking.' . . . 'A clear statement of the agency's reasoning is necessary because [a court] can affirm the agency's decision to deny benefits only on the grounds invoked by the agency.'") (citations omitted). That is significant because Exhibit 3F also shows that after the alleged onset date and over two years before Dr. Zhu stated that Plaintiff had "no difficulty" with daily activities, Dr. Zhu noted that Plaintiff reported that her arthritis "symptoms have been significantly limiting her daily activity," and that Plaintiff "fe[lt] much improved" on prednisone but her "symptoms resumed 4 or 5 days after she finished prednisone." (Tr. 411.) Further, Plaintiff completed a patient history form for Dr. Zhu on April 29, 2011, which stated that Plaintiff's husband "does most of the housework" and Plaintiff "[u]sually" has difficulty with bathing, morning stiffness, squatting, and getting up from a chair or the floor. (Tr. 420; *cf.* Tr. 14, indicating that Plaintiff submitted a letter to the Appeals Council

after the ALJ issued his decision, confirming that he does "most of the housework and cooking").[3]

Finally, the Court notes that Dr. Zhu diagnosed and treated Plaintiff's psoriatic arthritis. (Tr. 580, 712.) Dr. Zhu did not treat Plaintiff's other severe impairments. Thus, even if Plaintiff's arthritis stopped having a significant impact on her daily activity after years of treatment, that does not mean that Plaintiff's other severe impairments did not continue to have a significant impact on her daily functioning. (*Cf.* Tr. 440, reflecting that after the alleged onset date, Plaintiff reported that she experienced a flare in her chronic fatigue syndrome and was "spending '12 hours a day in bed'"; Tr. 213, showing that Plaintiff testified that she often "lack[s] energy to even get out of bed"; Tr. 13-15, noting that Plaintiff's husband's letter to the Appeals Council explained that Plaintiff developed chronic fatigue syndrome after having mononucleosis before the alleged onset date, and that since that time, Plaintiff has exhibited a continuous "pattern" where limited periods of increased exertion are followed by exhaustion and "longer periods of recovery").

In sum, the ALJ erred in discounting Plaintiff's testimony based on her reported activities.

///

///

---

[3] The Appeals Council found that Plaintiff's husband's letter did "not show a reasonable probability that it would change the outcome of the decision," and therefore "did not exhibit this evidence." (Tr. 2.) Nevertheless, the Court may consider the letter, on which Plaintiff relies (*see* Pl.'s Br. at 28), in this appeal. *Cf. Williams v. Berryhill*, No. 17-5885, 2018 WL 6737511, at *3 (W.D. Wash. Apr. 19, 2018) ("[A]lthough the Appeals Council stated '[w]e did not consider and exhibit this evidence,' this statement is contradicted by the Appeals Councils claim '[w]e find this evidence does not show a reasonable probability that it would change the outcome of the decision.' The new evidence presented to the Appeals Council is thus reviewable by the Court in determining whether the ALJ's decision remains supported by substantial evidence.") (citation omitted).

## 2. Effective Treatment

The ALJ also discounted Plaintiff's testimony because her "course of treatment during the time period at issue shows consistent medical improvement over time for each severe impairment." (Tr. 27; *see also* Tr. 25-27, referring to impairments that were "well-controlled" and treatment that was "effective"). An ALJ may discount a claimant's testimony based on effective treatment. *See Bettis v. Colvin*, 649 F. App'x 390, 391 (9th Cir. 2016) (holding that the ALJ met the clear and convincing reasons standard, and stating that the ALJ appropriately discounted the claimant's testimony on the ground that his "condition improved with treatment," because "'[i]mpairments that can be controlled effectively with [treatment] are not disabling'") (citation omitted). Here, however, substantial evidence does not support the ALJ's finding that during the period at issue, all of Plaintiff's severe impairments were effectively controlled with treatment.

The "time period at issue" here is February 15, 2011 (the alleged onset date) to December 31, 2013 (the date last insured). *See Lair-Del Rio v. Astrue*, 380 F. App'x 694, 695 (9th Cir. 2010) (referring to the relevant period in a Title II case as the time "between [the claimant's] onset date of April 1, 1998, and her date last insured of June 30, 1999," because a Title II claimant bears the burden of showing that "she was disabled as of the date last insured"). During this period, the ALJ found that Plaintiff suffered from the following severe impairments: (1) migraine headaches, (2) chronic fatigue syndrome, (3) asthma, (4) psoriatic arthritis, (5) obesity, and (6) PTSD. (Tr. 22.) The ALJ also recognized (as the Court has) that the "deciding factor" in this case is "probably . . . going to be [Plaintiff's] absences" from work (Tr. 97), because: (1) Plaintiff's records and testimony make clear that she would miss at least some work each month due to her impairments (*see* Tr. 24, noting that the ALJ's RFC reflected that Plaintiff would "miss about one day per month due [to] symptoms of her impairments"; *see also* Tr. 84,

reflecting that Plaintiff testified that during the time period at issue, she had more than one incapacitating migraine each month and spent "at least two days a week" in bed due to fatigue; Tr. 581, showing that Dr. Holmes opined that Plaintiff's impairments would cause her to "miss[] more than 2 days per month from work"); and (2) the VE testified that Plaintiff could not sustain gainful employment if she missed work "two days per month . . . on a regular, ongoing [basis]." (Tr. 94-95.)

Given the ALJ's findings, Plaintiff's medical evidence and testimony, and the VE's testimony, it is evident that Plaintiff's impairments cannot be considered effectively controlled by treatment if those impairments, considered singularly or in combination, would cause Plaintiff to miss work at least twice a month during the relevant period, because the VE testified that missing work at least twice a month would exceed an employer's customary tolerance for absences. The following record evidence demonstrates that, at minimum, Plaintiff's migraines were not effectively controlled, as they would have caused Plaintiff to miss work at least twice a month:

- February 15, 2011: Plaintiff's alleged disability onset date. (Tr. 20, 100.)

- March 14, 2011: During a follow-up visit with Dr. Holmes, Plaintiff, who had a history of migraine headaches (Tr. 25), reported that she knew she was having a migraine if her headache was not relieved by medication "after a few hours," and that she needed "6 doses of Imitrex to extinguish her last headache over the course of greater than 24 hours." (Tr. 434; *see also* Tr. 85, showing that Plaintiff told the ALJ that she is not functional during a migraine).

- May 10, 2011: Dr. Holmes stated that Plaintiff continued to experience migraines twice a month with "relatively prolonged symptoms," and referred to Plaintiff's migraines as "chronic, uncontrolled, [and] unchanged." (Tr. 443.)

- June 13, 2011: Plaintiff reported that she was having migraines "every week to . . . week and a half," which typically lasted at least twelve hours. (Tr. 444.) Dr. Holmes noted that Plaintiff's "[c]hronic migraines were quite controlled with only about on[e] every 2 weeks," but they were "complicated by [Plaintiff] recently starting" an arthritis medication. (Tr. 445.)

- July 12, 2011: Dr. Holmes noted that Plaintiff "continued to have migraines at her *baseline*, about one every 2 weeks." (Tr. 447) (emphasis added).

- September 22, 2011: During a follow-up visit with Dr. Holmes, Plaintiff reported that her migraines "improved a bit" after taking a different arthritis medication for a "couple of weeks," and that she was currently suffering from a migraine that had lasted for more than twenty-four hours. (Tr. 454.)

- November 28, 2011: Dr. Holmes stated that Plaintiff's "migraines have returned to a baseline [of] 2 times a month." (Tr. 456.)

- March 1, 2012: During a follow-up visit with Dr. Holmes, and over one year after her alleged onset date, Plaintiff reported that she had three migraine headaches in February 2012, but they were "in the setting of a large amount of stress." (Tr. 459.) Dr. Holmes noted that Plaintiff was "usually having her baseline 2 migraines a month," and that he believed that Plaintiff's return to

her baseline was attributable to the change in Plaintiff's arthritis medication. (Tr. 459-60.)

- August 23, 2012: Dr. Holmes stated that Plaintiff charted her migraines over the past month, and that Plaintiff's chart showed "11 headache days" and what appeared to be a "pattern" where Plaintiff suffered from days' long migraines around the time she removed and replaced her contraceptive. (Tr. 469-70; *see also* Tr. 526, noting that Dr. Holmes stated in 2015 that he has "found [Plaintiff's contraceptive] to be particularly problematic for some migraine patients"). Plaintiff informed Dr. Holmes that over the years, she has noticed that she had "worsening migraines around the time of her menses." (Tr. 469.)

- October 19, 2012: Plaintiff informed Dr. Holmes that she followed his recommendations regarding the use of her contraceptive, and that her migraines seemed to "overall be shorter," but it was "hard to say if she [was] having less migraines." (Tr. 476.) Given these reports, Dr. Holmes referred to Plaintiff's migraines as "stable to improved" and "overall fairly stable."[4] (Tr. 476.)

- November 30, 2012: Plaintiff complained about increasing migraines over "the last 2 months." (Tr. 480.) Plaintiff informed Dr. Holmes that these

---

[4] As this Court has previously explained, "'[a] doctor's notation that a condition is 'stable' during treatment does not necessarily support the conclusion that the patient is able to work.'" *Timothy W. v. Berryhill*, No. 1:17-cv-01041-SB, 2018 WL 6817030, at *10 (D. Or. Oct. 16, 2018) (quoting *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 357 (3d Cir. 2008)); *see also Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008) (observing that the ALJ had a "tendency to overlook or mischaracterize relevant evidence," and noting that "the ALJ consistently interpret[ed] reports that [the claimant's medical] condition has been 'stable' to mean that [the claimant's] condition has been good, when the term could mean only that her condition has not changed").

migraines "usually last[ed] . . . 2 to 3 hours and then are relieved by her usual 2 Imitrex pills, which then result[s] in a period of complete resolution for 24 to 36 hours and then after the this [resolution] time[,] the usual throbbing headache associated with nausea and rarely spots in the front of [her] vision recurs." (Tr. 480.) Dr. Holmes noted that Plaintiff's migraines were "moderately severe in terms of pain," and increased after discontinuing her contraceptive. (Tr. 480.) Dr. Holmes added that although Plaintiff's "chronic" and "recurrent" migraines had "worsened most likely secondary to [Plaintiff] now being postmenopausal and off her [contraceptive]," he was "actually a little more comfortable with [Plaintiff's] current pattern given that the headaches have been reliably extinguishing after 24 to 36 hours rather than her prior pattern of sometimes needing to take Imitrex repeatedly for 36 hours or so before the headache resolved." (Tr. 482.) Dr. Homes also elected to "[s]tart" prescribing Plaintiff Topamax to treat her migraines. (Tr. 482.)

- December 14, 2012: During her two-week follow-up visit, Plaintiff informed Dr. Holmes that she "did not have any migraines headaches until yesterday," and that despite taking several Imitrex, her migraine had still not resolved. (Tr. 484-85.)

- January 10, 2013: Plaintiff reported that she was "still having some headaches," but she only had one migraine over the last month. (Tr. 492-93.) Although he referred to this as a "huge improvement," Dr. Holmes still considered increasing Plaintiff's dosage of Topamax given her headaches. (Tr. 493.)

- December 31, 2013: Plaintiff's date last insured. (Tr. 20, 100.)

- July 25, 2015: Dr. Holmes stated that Plaintiff's migraines "usually cause[] enough dysfunction she would miss a day of work" before her symptoms resolve. (Tr. 581.)

- July 6, 2017: Plaintiff testified at a hearing before the ALJ. (Tr. 37-99.) During the hearing, Plaintiff told the ALJ that she has "had trouble with migraines for years," she continues to experience "one [incapacitating migraine] a month," and she considers her migraines "under control now," but her migraines were much "worse" during the relevant time period. (Tr. 57-58, 84-85.)

Given this evidence, substantial evidence does not support the ALJ's finding that all of Plaintiff's severe impairments, including migraine headaches, were effectively controlled by treatment during the relevant time period. Indeed, the evidence described above shows that Plaintiff suffered from incapacitating migraines at least twice a month during the relevant period, and that this pattern persisted for at least two years post-onset date.[5] Thus, Plaintiff's migraines were not effectively controlled, as they would have caused her to exceed an employer's customary tolerance for absences. (*Cf.* Tr. 94-95, "If an individual were to miss two days per month due to . . . [her] various medical conditions including the migraine headaches, would that be accommodated in the -- past work or the jobs you identified [as suitable for Plaintiff]? A. I think the answers are no and no[.] . . . Q. That's more than would be reasonably accommodat[ed] [by an employer]? A. Yes, from my experience [as a VE], yes. Particularly if it's a regular

---

[5] It is important to note that many of Plaintiff's migraines lasted more than twenty-four hours. The ALJ failed to consider that such a migraine could prevent Plaintiff from working multiple days.

ongoing occurrence."; *see also* Tr. 84, reflecting that Plaintiff was also suffering from chronic fatigue syndrome during the relevant time period, which caused her to be "in bed at least two days a week").

In conclusion, the ALJ erred in finding that all of Plaintiff's severe impairments were effectively controlled.

### C. Objective Medical Evidence

The ALJ also discounted Plaintiff's testimony on the ground that it was not supported by the objective medical evidence. (*See* Tr. 25-26, stating that Plaintiff's reports were not supported by her physical examinations and her rheumatologist's "objective findings"; *see also* Def.'s Br. at 4-9, arguing that the ALJ gave three clear and convincing reasons for discounting Plaintiff's testimony, and citing conflicting "objective examination findings" as one reason). As discussed above, the ALJ erred in discounting Plaintiff's testimony based on her activities and the effective treatment of all her severe impairments. Thus, even if Plaintiff's testimony is not supported by the objective medical evidence, the ALJ cannot properly rely on that as the sole reason to discredit Plaintiff's testimony. *See Taylor v. Berryhill*, 720 F. App'x 906, 907 (9th Cir. 2018) (explaining that a "lack of objective medical evidence cannot be the sole reason to discredit claimant testimony," and therefore holding that the ALJ failed to provide clear and convincing reasons for discounting the claimant's testimony about debilitating mental and physical impairments) (citation omitted). Accordingly, the ALJ erred in discounting Plaintiff's testimony.[6] *See Heltzel v. Comm'r of Soc. Sec. Admin.*, No. 19-1287, 2020 WL 914523, at *4 (D.

---

[6] The Court also notes that Plaintiff suffers from chronic fatigue syndrome, and therefore did not need to present objective evidence to show the severity of her fatigue. *Cf. Putz v. Astrue*, 371 F. App'x 801, 802 (9th Cir. 2010) (holding that the ALJ failed to meet the clear and convincing reasons standard, and noting that the claimant, who suffered from chronic fatigue syndrome, "need not present objective medical evidence to demonstrate the severity of her fatigue").

Ariz. Feb. 26, 2020) ("Because the ALJ's other reasons for rejecting Plaintiff's testimony were legally insufficient, a mere lack of objective support, without more, is insufficient to reject Plaintiff's testimony.").

## II.     MEDICAL OPINION EVIDENCE

### A.     Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (citation omitted). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim*, 763 F.3d at 1161 (citation omitted).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison*, 759 F.3d at 1012 (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "'The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.'" *Id.* (quoting *Reddick*, 157 F.3d at 725). "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citation omitted).

///

### B.  Analysis

Plaintiff argues that the ALJ failed to provide specific and legitimate reasons for discounting the opinion of Plaintiff's treating physician, Dr. Holmes. (Pl.'s Br. at 12.) The Court agrees.

Dr. Holmes completed a treating source statement on July 25, 2015. (Tr. 580-81.) Dr. Holmes explained that Plaintiff suffers from "multiple medical" impairments, including migraines, chronic fatigue syndrome, psoriatic arthritis, asthma, and PTSD. (Tr. 580-81.) Dr. Holmes also explained that Plaintiff's impairments would "preclude her from engaging in full-time employment," Plaintiff's impairments would likely "disrupt her ability to attend an 8 hour per day job 5 days per week on a sustained basis without missing more than 2 days per month from work," Plaintiff's inability to attend to a full-time job "has been the case for at least a few years," and Plaintiff's fatigue "would likely cause her to miss additional days of work." (Tr. 580-81.)

The ALJ assigned only "some weight" to Dr. Holmes' opinion. (Tr. 27.) In support of his decision, the ALJ noted that Dr. Holmes' opinion "was made substantially after [Plaintiff's date last insured] and does not specifically state that it is addressing her functionality during the time period at issue," and that Dr. Holmes' opinion "conflate[d]" Plaintiff's "status in 2015, well after the [date last insured], with her status prior to the [date last insured] and for the following year through 2014." (Tr. 27.) The Commissioner argues that the ALJ appropriately discounted Dr. Holmes' opinion on this ground, noting that "[a]n opinion that does not pertain to the relevant time period may be discounted, especially when it conflicts with contemporaneous exam findings." (Def.'s Br. at 15) (citation omitted). The Court finds the Commissioner's argument unpersuasive.

Dr. Holmes' opinion makes clear that he believed that "for at least a few years" (i.e., since at least the relevant time period, as Dr. Holmes issued his opinion on July 25, 2015), Plaintiff's impairments have prevented her from working. (Tr. 581.) Dr. Holmes also stated that Plaintiff "has a history of migraine headaches," and cited record evidence from the relevant time period. (Tr. 580-81.) Further, Plaintiff's counsel's letter to Dr. Holmes asked him to try and limit his "comments to the time period prior to" December 31, 2013, the date last insured. (Tr. 582.) Thus, it is clear that Dr. Holmes' opinion pertains to Plaintiff's condition before her date last insured.

The Commissioner "does not dispute that Dr. Holmes also cited evidence from the relevant period and stated [Plaintiff] had limitations for 'at least a few years.'" (Def.'s Br. at 15.) The Commissioner, however, argues that it was "ultimately for [the] ALJ to resolve the conflicts and ambiguities in Dr. Holmes' opinion," noting, among other things, that Dr. Holmes stated that "[a]t this point" Plaintiff's migraines would cause her to leave work or miss work once a month. (Def.'s Br. at 15.)

Although Dr. Holmes referred to Plaintiff's inability to work due to migraines "[a]t this point," Dr. Holmes also stated that (1) "for at least a few years," Plaintiff's "multiple medical problems," which include migraines and chronic fatigue, would cause her to miss multiple days of work per month (i.e., Plaintiff could not sustain full-time employment), (2) Plaintiff's migraines "usually cause[] enough dysfunction she would miss a day of work," and (3) Plaintiff's chronic fatigue syndrome would "likely cause her to miss additional days of work." (Tr. 581.)

Furthermore, the longitudinal record shows that (1) before the date last insured, Dr. Holmes referred to two debilitating migraines a month as Plaintiff's "baseline," (2) contrary

to the ALJ's finding (*see* Tr. 27), Dr. Holmes' records do not show "improvement of migraines in 2012," and (3) Dr. Holmes' opinion and contemporaneous findings align with Plaintiff's testimony. (*See* Tr. 447, showing that on July 12, 2011, Dr. Holmes stated that Plaintiff "continued to have migraines at her baseline, about one every 2 weeks"; Tr. 456, reflecting that on November 28, 2011, Dr. Holmes stated that Plaintiff's "migraines have returned to a baseline [of] 2 times a month"; Tr. 459-60, indicating that on March 1, 2012, Plaintiff reported that she had three migraine headaches in February 2012, and Dr. Holmes noted that Plaintiff was "usually having her baseline 2 migraines a month"; Tr. 476, showing that on October 19, 2012, Dr. Holmes referred to Plaintiff's migraines as "stable to improved" and "overall fairly stable"; Tr. 480, reflecting that on November 30, 2012, Plaintiff complained about increasing migraines over "the last 2 months," and Dr. Holmes stated that Plaintiff's "chronic" and "recurrent" migraines had "worsened"; Tr. 581, indicating that on July 25, 2015, Dr. Holmes stated that Plaintiff's impairments would cause her to miss multiple days of work a month, that Plaintiff's history shows her migraines "usually" would cause her to miss work, and that "[a]t this point," Plaintiff's migraines would cause her to "leave work or be unable to work one day per month"; Tr. 57-58, 84-85, showing that on July 6, 2017, Plaintiff explained to the ALJ that she has "had trouble with migraines for years," she continues to experience "one [incapacitating migraine] a month," and she considers her migraines "under control now," but her migraines were much "worse" during the relevant period, i.e., she experienced more than one debilitating migraine a month).

It is clear from the foregoing that Dr. Holmes did not conflate the relevant time periods, Dr. Holmes' opinion pertains to the relevant time period, Dr. Holmes' opinion and contemporaneous findings regarding Plaintiff's migraines are unambiguous, and Dr. Holmes'

opinion and findings are consistent with Plaintiff's testimony. Accordingly, the Court finds that the ALJ erred in discounting Dr. Holmes' opinion on the grounds that it was issued after Plaintiff's date last insured and did not specifically state that it applied to the relevant time period. *Cf. Bartlett v. Berryhill*, No. 16-1294, 2017 WL 2464117, at *6 (W.D. Wash. June 7, 2017) ("The ALJ also discounts [the nurse's] opinion as it was rendered after the date last insured. But, as with [the physician's] opinion, [the nurse's] opinion is still relevant to assessing Plaintiff's condition during the relevant period, especially as [the nurse] treated Plaintiff before her date last insured.").

In discounting Dr. Holmes' opinion, the ALJ also stated that (1) Dr. Holmes' opinion was not "fully consistent with the treatment records [through] the [date last insured] of December 31, 2013," (2) Plaintiff's functioning was "significantly better in 2012 through 2013," and (3) Plaintiff's "treatment reports are generally more consistent with State agency assessments for the material period than with Dr. Holmes' assessment." (Tr. 27.) The evidence described above demonstrates that these findings are not supported by substantial evidence. Indeed, Dr. Holmes' opinion that Plaintiff would miss at least two days of work each month aligns with the pre-December 31, 2013 record evidence, which shows that two debilitating migraines per month was Plaintiff's baseline, and that Plaintiff spent several days a month in bed due to her chronic fatigue symptoms. The record also fails to show that Plaintiff's migraines and fatigue were "significantly better." Thus, the non-examining state agency physicians' opinions that Plaintiff can sustain gainful employment is not "more consistent" with Plaintiff's treatment reports than Dr. Holmes' opinion.

In sum, the ALJ failed to provide specific and legitimate reasons for discounting Dr. Holmes' opinion.[7]

## III.    REMEDY

### A.    Applicable Law

"Generally when a court of appeals reverses an administrative determination, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citation omitted). In a number of cases, however, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits when [the three-part credit-as-true standard is] met." *Garrison v. Colvin*, 759 F.3d 995, 1021 (9th Cir. 2014) (citations omitted).

The credit-as-true standard is met if three conditions are satisfied: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020 (citations omitted). Even when the credit-as-true standard is met, the court retains the "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021.

///

---

[7] The Court does not address Plaintiff's remaining arguments because, as discussed below, the Court finds it appropriate to exercise its discretion to remand this case for an award of benefits.

## B.      Analysis

The Court finds that the credit-as-true standard is satisfied here and that remand for an award of benefits is warranted.

First, the Court finds that the record has been fully developed. It includes over a decade's worth of treatment notes, testimony from Plaintiff (and third parties) about Plaintiff's symptoms and limitations, and an opinion from Plaintiff's long-time treating physician, Dr. Holmes. The ALJ and Plaintiff's counsel asked the VE hypothetical questions that addressed whether a worker with Plaintiff's limitations could sustain gainful employment, and the VE testified that Plaintiff's limitations would preclude work. (*See* Tr. 94-95, "If an individual were to miss two days per month due to . . . [her] various medical conditions including the migraine headaches, would that be accommodated in the -- past work or the jobs you identified [as suitable for Plaintiff]? A. I think the answers are no and no[.] . . . Q. That's more than would be reasonably accommodat[ed] [by an employer]? A. Yes, from my experience [as a VE], yes. Particularly if it's a regular ongoing occurrence."; *cf.* Tr. 447, 456, 459-60, reflecting that Dr. Holmes referred to two incapacitating migraines a month as Plaintiff's "baseline" during the relevant period; Tr. 581, indicating that Dr. Holmes stated that Plaintiff's impairments would cause her to miss multiple days of work each month; Tr. 57-58, 84-85, showing that Plaintiff testified that she continues to experience "one [incapacitating migraine] a month," her migraines were much "worse" during the relevant period, i.e., she experienced more than one debilitating migraine a month, and her chronic fatigue syndrome caused her to be "in bed at least two days a week" during the relevant period).

As to further proceedings, the Commissioner argues that further proceedings are warranted here. In support of this argument, the Commissioner notes that (1) the "ALJ did not provide a boilerplate analysis," and (2) if the Court determines that the Commissioner

impermissibly raised any *post hoc* rationalizations, it "would favor a remand," consistent with the Ninth Circuit's decision in *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014). (Def.'s Br. at 19.)

In *Burrell*, the Ninth Circuit remanded for further proceedings because the record created serious doubt about whether the claimant was disabled, not because the Commissioner impermissibly raised *post hoc* rationalizations. *See Burrell*, 775 F.3d at 1142 ("[B]ecause the record . . . contains cause for serious doubt, we remand with instructions that the district court remand to the ALJ for further proceedings on an open record."). The record here regarding Plaintiff's migraines and fatigue does not create such doubt. Furthermore, Ninth Circuit precedent and the objectives of the credit-as-true standard foreclose any argument that a remand for the purpose of allowing the ALJ to have a mulligan qualifies as a remand for a "useful purpose":

> Although the Commissioner argues that further proceedings would serve the 'useful purpose' of allowing the ALJ to revisit the medical opinions and testimony that she rejected for legally insufficient reasons, our precedent and the objectives of the credit-as-true rule foreclose the argument that a remand for the purpose of allowing the ALJ to have a mulligan qualifies as a remand for a 'useful purpose' under the first part of credit-as-true analysis.

*Garrison*, 759 F.3d at 1021; *see also Benecke*, 379 F.3d at 595 ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication."); *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir. 2004) ("The Commissioner, having lost this appeal, should not have another opportunity to show that [the claimant] is not credible any more than [the claimant], had he lost, should have an opportunity for remand and further proceedings to establish his credibility."). Accordingly, the Court finds that Plaintiff meets the first part of the credit-as-true analysis.

Second, as discussed above, the ALJ failed to provide legally sufficient reasons for rejecting Plaintiff's testimony and Dr. Holmes' opinion. Accordingly, the Court finds that Plaintiff satisfies the second part of the credit-as-true analysis.

Third, if the improperly discredited evidence were credited as true, the ALJ would be required to find Plaintiff disabled because her impairments would cause her to exceed the customary tolerance for absences. *Cf. Revels v. Berryhill*, 874 F.3d 648, 662-69 (9th Cir. 2017) (noting that the claimant's treating physician's opinion was contradicted by the non-examining state agency physicians, explaining that "the opinions of nonexamining doctors 'cannot by [themselves] constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician,'" and remanding for an award of benefits because, if credited as true, the claimant's physician's improperly discredited opinion established that she "could not work").

For these reasons, and because the Court does not have serious doubt about whether Plaintiff is disabled, the Court exercises its discretion to remand this case for an award of benefits.

## CONCLUSION

For the reasons stated, the Court REVERSES the Commissioner's decision and REMANDS for an award of benefits.

**IT IS SO ORDERED.**

DATED this 31st day of March, 2020.

_____
STACIE F. BECKERMAN
United States Magistrate Judge